IRA N. SMITH AND SYDELL SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 3832-79.
United States Tax Court
T.C. Memo 1988-238; 1988 Tax Ct. Memo LEXIS 266; 55 T.C.M. (CCH) 970; T.C.M. (RIA) 88238; May 26, 1988. Ira N. Smith, pro se. Martha Sullivan, Arthur J. Gonzalez and Sharon Katz-Pearlman, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioners' 1973 Federal income tax in the amount of $ 6,763. The deficiency resulted from respondent's adjustments to the 1973 partnership return of Beachhead Properties. After concessions by petitioner, the issues for decision are 1) whether petitioners are entitled to an investment tax credit and miscellaneous deductions in relation to their investment in Beachhead Properties, a limited partnership formed to purchase and commercially exploit a motion picture; 2) whether petitioners are liable for additional interest under section 6621(c); [1] and 3) whether petitioners are liable for damages under section 6673. *269 FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners' residence at the time of filing of their petition was Oyster Bay Cove, New York. Beachhead Properties ("Beachhead") was formed as a New York limited partnership in November 1973 for the purpose of acquiring all rights to a motion picture, and to distribute and exploit those rights in the United States and Canada. During the 1973 taxable year, petitioner, Ira Smith ("petitioner"), was a limited partner in Beachhead, contributing $ 13,150 for a 3.304 percent interest in profits and losses. Larry Gordon was the general partner of Beachhead. On December 11, 1973, Beachhead entered into an agreement with Lion International Films, the International Division of British Lion Film Limited, an English corporation, whereby Beachhead purchased all the United States and Canadian rights to a motion picture entitled "The Wicker Man" ("the movie"). In a letter to Beachhead dated December 11, 1973, attached to the Purchase Agreement, the Director of Lion International Films certified that as of December 1, 1973, the *270 movie had not been released in any country and that it had only since then been first released in London. The purchase price for the movie consisted of a check in the amount of $ 280,000 and a nonrecourse promissory note in the principal amount of $ 1,520,000 and bearing interest at the rate of 6 percent per annum. Petitioner signed the Purchase Agreement as attorney-in-fact for the general partner. Principal and interest on the note were due on January 2, 1986. The note provided that in the event of a default, Lion International Films would have no right to proceed against Beachhead or against any general or limited partner of Beachhead. The note was signed by petitioner as attorney-in-fact for the general partner. The record does not reflect whether any principal or interest was ever paid. The note was secured by the movie as provided in a security agreement also executed on December 11, 1973. The security agreement was also signed by petitioner as attorney-in-fact for the general partner of Beachhead. A certificate of production cost signed by the Director of British Lion Film Productions Limited stated that the cost of production of "The Wicker Man" was $ 1,411,987.50. *271 The record does not reflect whether petitioner or any of the partners made any attempt to ascertain the veracity of the figures used in that certificate. Also on December 11, 1973, Beachhead entered into a distribution agreement with National General Pictures Corporation ("National"). The term of the agreement was 12 years. The agreement provided that National was to release the movie commercially as soon as practicable in 1974. The agreement also provided that the distributor would manufacture 100 prints of the movie and that not less than $ 100,000 would be expended for advertising the movie during 1974. The distributor was to pay Beachhead 30 percent of the first $ 1,000,000 of gross receipts; 35 percent of gross receipts in excess of $ 1,000,000 up to receipts of $ 1,300,000; 40 percent of gross receipts in excess of $ 1,300,000; and 50 percent of gross receipts in excess of $ 1,500,000. The distributor was to pay all costs of distribution including costs of prints and advertising out of its share of gross receipts. Petitioner signed the distribution agreement as attorney-in-fact for the general partner of Beachhead. The distributor went out of business in early 1974. *272 The record contains no evidence as to whether the film was ever released in the United States or Canada, whether the distributor ever paid any amounts to Beachhead or whether Beachhead made any efforts to secure a new distributor. The movie was produced by Larry Gordon, the general partner of Beachhead. The main members of the cast were Edward Woodward, Britt Eckland, Diane Cilento and Christopher Lee. The picture was rated "R." The film is about a police sergeant who travels to an island off the coast of Scotland to search for a missing young girl. He discovers that the missing girl is alive but will be used for a human sacrifice to ensure a bountiful crop for the following year. He disguises himself as one of the celebrants at the sacrifice ceremony but is discovered and is then designated as the one to be sacrificed. He is placed in a large wicker image of a man which is set afire, and he is burned to death. The record does not reflect whether petitioner viewed the movie prior to purchasing his interest in Beachhead. On his 1973 Federal income tax return, petitioner claimed $ 60,194 as his share of Beachhead's basis in the movie, an amount which includes the nonrecourse *273 note. Petitioner claimed an investment tax credit for 1973 in the amount of $ 4,213. Additionally, petitioner claimed a loss of $ 2,575 in 1973 based upon his distributive share of partnership losses claimed by Beachhead. OPINION Respondent advances a number of arguments to support the disallowance of the claimed deductions, losses and credits. Respondent's principal argument is that those items arose out of activities not engaged in for profit. Petitioner maintained that he invested in the partnership in good faith with the bona fide objective of making a profit, and that the partnership's activities were engaged in with the primary and predominant purpose and objective of making a profit. The parties argued the issues of profit objective in terms of the subjective test of section 183. However, in Rose v. Commissioner,88 T.C. 386 (1987), this Court set forth an objective test under which certain transactions are disregarded if they are found to be devoid of economic substance. This test incorporates the objective factors found to be relevant in cases decided under *274 section 183, as well as concepts underlying sections 38, 162, 167 and 212. Respondent's determinations are presumed correct, and petitioners bear the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934). Taxpayers bear the burden of proving their entitlement to the deductions they claim. Welch v. Helvering, supra.For the reasons set forth below, we find that Beachhead's activities lacked economic substance, and that petitioner is not entitled to any losses, deductions or credits arising out of his interest as a limited partner in Beachhead. We are faced here with a complete lack of evidence which would support petitioner's claimed tax benefits. Petitioner provided no evidence regarding the promotion of the partnership, the circumstances surrounding the purchase of the film, determination of the purchase *275 price, or whether the nonrecourse note was a genuine indebtedness. What evidence the record does contain strongly supports respondent's arguments that the activities were entered into solely for tax benefits. Of primary significance is the fact that the bulk of the purchase price was paid by means of a nonrecourse note which was secured only by the film. There was no evidence that the fair market value of the film reasonably approximated the purchase price. Respondent presented expert testimony by Woodrow Sherrill who has spent over 30 years in various aspects of the movie business and was well-qualified. He appraised the value of the film at $ 5,625. We find this to be the fair market value of the movie. Since the note was secured only by the film, repayment of the note was contingent upon the success of the film. Because the fair market value of the film did not reasonably approximate the purchase price, and because repayment was contingent on the success of the movie, we conclude that the nonrecourse note does not evidence a genuine indebtedness. Estate of Franklin v. Commissioner,64 T.C. 752 (1975), *276 affd. 544 F.2d 1045 (9th Cir. 1976); Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Since interest was not paid on genuine indebtedness, it is not deductible under section 163(a). Knetsch v. Commissioner,364 U.S. 361 (1960). With respect to petitioner's argument that Beachhead did not take a deduction for accrued interest on the nonrecourse note but rather the interest expense resulted from "discounted investor notes," there is simply no evidence whatsoever to support this claim. As we noted above, there is no indication that this transaction had any economic substance. The lack of evidence as to the nature of the dealings between the parties, the disparity between the purchase price and the fair market value of the movie, and the illusory nature of the financing convince us that petitioner's activity is devoid of economic substance. Accordingly, no deductions are allowable under section 162. More specifically, petitioner is not entitled to any depreciation deductions because there *277 is no evidence that the property depreciated was used in a trade or business held for production of income. Section 167(a). Finally, we address petitioner's claim of entitlement to an investment tax credit. An investment tax credit is available only for property with respect to which depreciation is allowable. Section 48(a). Section 48(k)(l)(A)(i) specifically provides that a credit shall be allowable under section 38 to a taxpayer with respect to any motion picture film "only if such film or tape is new section 38 property." This section was made applicable to the taxable year in question by section 804(d), Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1591, 1596, 1976-3 C.B. (Vol. 1) 72, which states as follows: (d) Entitlement to Credit. -- Paragraph (1) of section 48(k) of the Internal Revenue Code of 1954 (relating to entitlement to credit) shall apply to any *278 motion picture film or video tape placed in service in any taxable year beginning before January 1, 1975.
See also Fife v. Commissioner,82 T.C. 1 (1984). A qualified film is placed in service when it is first publicly exhibited for entertainment purposes. Section 1.48-8(a)(5), Income Tax Regs.
Petitioner fails to satisfy any of the requirements for an investment tax credit. First, the film was not properly used in a trade or business or held for the production of income, and therefore, it is not property for which depreciation is allowable. Second, there is no evidence in the record that the movie qualified as "new section 38 property." Finally, there is no evidence of when, if ever, the film was "placed in service." For the foregoing reasons, petitioner is not entitled to an investment tax credit. We now turn to a consideration of whether the deficiency at issue here is due to a tax-motivated transaction such that petitioner is liable for increased interest as provided in section 6621(c). [2]Section 6621(c) provides for an increase in *279 the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $ 1,000) attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates types of transactions which are to be considered "tax-motivated transactions." These transactions include any sham or fraudulent transaction. Section 6621(c)(3)(A)(v). Since we have held in the instant case that the transaction at issue lacked economic substance, section 6621(c) is applicable. Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). Therefore, petitioner is liable for additional interest under that section. Petitioner has argued that section 6621(c) is solely applicable to tax returns filed after December 31, 1984. This point has been decided by this Court in Solowiejczyk v. Commissioner,85 T.C. 552 (1985), *280 affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986), where we concluded that the fact that the taxable year in issue predates the imposition of section 6621 is not, as petitioner states, an unconstitutional retroactive application of the statute. Finally, we turn to respondent's request that damages in the amount of $ 5,000 be awarded under section 6673. Section 6673 provides that damages of up to $ 5,000 shall be awarded to the United States when it appears that a taxpayer has instituted or maintained proceedings primarily for delay or that the taxpayer's position is frivolous or groundless. Throughout the long history of this case, petitioner was extremely uncooperative with both respondent and the Court. Prior to trial, he failed to respond to informal discovery requests and only minimally complied with formal discovery requests. Petitioner was made aware of the great weight of authority contrary to his position. At trial, petitioner completely failed *281 to produce relevant evidence to support his claims. On numerous occasions, petitioner portrayed himself as a naive limited partner with no ability to obtain information necessary to prosecute his case. However, we note that petitioner is an attorney and signed many of the documents used in this transaction as the attorney-in-fact for the general partner. Accordingly, we have no sympathy for his claimed inability to obtain information. We conclude that the facts of this case show that the proceeding has been instituted and maintained primarily for delay and warrant the imposition of the maximum amount of damages ($ 5,000) under section 6673 and, accordingly, we award damages to the United States of $ 5,000. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect during the years in issue. Former section 6621(d) was redesignated as section 6621(c)↩ pursuant to section 1511(c), Tax Reform Act of 1986, 100 Stat. 2744. 2. Respondent raised this issue in an amendment to answer and, therefore, bears the burden of proof. Rule 142(a)↩.